# STATE OF MICHIGAN

# COURT OF APPEALS

PROFESSIONAL CONTRACTING AND
CONSULTING INC.,

Plaintiff-Appellant,

v

MERCHANTS BONDING COMPANY,

Defendant,

and

MOHAMMAD SOBH, BLUE LOTUS HOOKAH
LOUNGE LLC, KHALED MOHAMED,
BLOOMFIELD INSTITUTIONAL
OPPORTUNITY FUND LLC, BRODER &
SACHSE REAL ESTATE SERVICES INC., WE
FIGHT THE LAW PLLC, and RACINE
MICHELLE MILLER,

Defendants-Appellees.

UNPUBLISHED
September 14, 2017

No. 332317
Washtenaw Circuit Court
LC No. 14-000437-CH

Before: HOEKSTRA, P.J., and METER and K. F. KELLY, JJ.

PER CURIAM.

Plaintiff, Professional Contracting and Consulting Inc. (plaintiff or PCC), appeals as of right an order entering judgment in its favor in the amount of $20,200 against defendant, Blue Lotus Hookah Lounge LLC (Blue Lotus), and granting case evaluation sanctions against it. We affirm in part, reverse in part and remand for further proceedings.

## I. BASIC FACTS

Defendant Khaled Mohamed (Mohamed) managed Blue Lotus. Blue Lotus signed a commercial lease in April 2012 with its landlord, occupying two separate areas of the building – the first being a restaurant where smoking was prohibited and the second being the hookah lounge itself. Blue Lotus hired PCC to provide engineering consultation and improvements to the tenancy sometime in July 2012. However, in August 2012, the landlord's mortgage

-1-

company, Bloomfield Institutional Opportunity Fund, LLC (Bloomfield)[1], began foreclosure proceedings due to the landlord's failure to make the mortgage loan payments. Ultimately, Blue Lotus was evicted from the property in February 2013. Mohamed believed that the eviction was the result of ethnic discrimination and threatened to sue Bloomfield. Blue Lotus, through its attorney Elsayed Mostafa (Mostafa), sued the landlord for breach of lease, fraud, and misrepresentation related to the failure to make promised improvements to the building, for misrepresenting the status of the heating and air conditioning systems, and misrepresenting the number of months of rent credit that Blue Lotus was to receive. During the lawsuit against the landlord, Blue Lotus attached as evidence two invoices for $152,000 and $20,000. Blue Lotus obtained a default judgment against the landlord, but was unsuccessful in collecting on the judgment.

Blue Lotus filed a construction lien against the property on April 1, 2013. PCC – who had provided Blue Lotus consulting and construction services – also recorded two construction liens against the property on January 7, 2013 and April 18, 2013 for work that it provided between July 2012 and December 2012. Bloomfield brought an action against Blue Lotus and PCC for slander of title and to quiet title. The parties later entered into a settlement agreement on April 30, 2013, whereby Bloomfield agreed to pay $100,000 to Racine Miller (Miller) and the law firm We Fight the Law (law firm), who represented Blue Lotus and Mohamed, in exchange for the discharge of all three liens. The construction liens were discharged on April 30, 2013.

PCC claimed that the settlement was entered into without its consent. The validity of settlement and the lien discharges is the subject of this appeal. The discharges were purportedly signed by PCC's agent, Mohammad Ghabdan (Ghabdan). The documents were notarized by Mohamad Sobh (Sobh) after he confirmed Ghabdan's identity by allegedly relying on Mohamed's claim that Ghabdan was who he purported to be. Ghabdan claimed that his signatures were forged.

PCC sued Merchant's Bonding Company,[2] Blue Lotus, Mohamed, Bloomfield, Broder, the law firm, and Miller. The complaint alleged that PCC provided consultation, labor and materials under a written agreement and later oral agreement. PCC argued that it was owed $172,200, using the figures and invoices that Blue Lotus used in its action against the landlord. PCC alleged that it was totally ignorant of the settlement agreement and had received none of the $100,000. More importantly, PCC argued that none of Ghabdan's signatures were valid and they were all forgeries. PCC alleged:

> Defendants Sobh, Blue Lotus, and Khaled Mohamed did conspire and confederate to prepare forged signatures of Mohammad Ghabdan and have them notarized by Defendant Sobh and to present these to Bloomfield and [Broder] for the purposes of victimizing and cheating Plaintiff via fraud, deceit and dishonest means and thus obtain $100,000.00 in settlement proceeds without remitting any funds to

---

[1] Broder & Sachse Real Estate Services, Inc. (Broder) is a broker.

[2] Sobh had a $10,000 bond with Merchant.

Plaintiff, despite the fact that Blue Lotus exploited the PCC obligations it owed as leverage to obtain settlement funds from Bloomfield.

PCC sought to judicially invalidate the settlement agreement and the lien discharges, alleging, *inter alia*, violations of the Michigan Notary Public Act, MCL 55.561 *et seq*.

Bloomfield and Broder were granted summary disposition following an August 28, 2014 hearing. Miller and the law firm were likewise granted summary disposition soon thereafter. The five-day trial, therefore, focused primarily on whether and to what extent Blue Lotus owed PCC for work performed at the property and whether the defendants conspired to have Sobh falsely notarize Ghabdan's signatures.

The trial court ruled that Sobh was entitled to a directed verdict where the evidence clearly demonstrated that Sobh acted within his own personal knowledge based on Mohamed's representations. On its own motion, the trial court further determined that Blue Lotus, as a corporation, was not subject to the Notary Public Act and directed verdict in its favor on those claims. The trial court later directed a verdict in favor of Mohamed on the Notary Public claims.

The only matter submitted to the jury was whether Blue Lotus breached one or more contracts with PCC. Plaintiff claimed that there was a written contract for seven thousand with an oral amendment for $20,200. Plaintiff further claimed that there was a second written construction management services contract that was superseded by oral contract for an open account on which $152,000 was charged. The jury concluded that Blue Lotus breached a contract for consulting services and that PCC's damages were $100. It found that Blue Lotus did not breach a contract for labor and materials, but that Blue Lotus breached its contract on an open account and that PCC's damages were $28,300.

Plaintiff voluntarily dismissed its claim against Merchant. The trial court entered an order dismissing Sobh on October 23, 2015. It entered an order dismissing Mohamed from the case on November 5, 2015. The trial court's January 7, 2016 order granting Sobh's motion for case evaluation sanctions was deemed the final order in the case.

PCC now appeals as of right, raising a myriad of issues which are, in large part, inadequately briefed.

## II. DIRECTED VERDICT IN FAVOR OF SOBH

Plaintiff argues that the trial court erred when it directed a verdict in Sobh's favor. We agree, in part.

> We review de novo a trial court's decision to direct a verdict. In doing so, we review the evidence and all legitimate inferences in the light most favorable to the nonmoving party. Only if the evidence, when viewed in this light, fails to establish a claim as a matter of law should a motion for a directed verdict be granted. [*Krohn v Home-Owners Ins Co*, 490 Mich 145, 155; 802 NW2d 281 (2011) (footnotes and quotation marks omitted).]

"A directed verdict is appropriate where reasonable minds could not differ on a factual question." *Chouman v Home Owners Ins Co*, 293 Mich App 434, 441; 810 NW2d 88 (2011). "When evaluating a motion for directed verdict, the court must consider the evidence in the light most favorable to the nonmoving party, making all reasonable inferences in the nonmoving party's favor." *Id.* "If reasonable jurors could honestly have reached different conclusions, neither the trial court nor this Court may substitute its judgment for that of the jury. The appellate court recognizes the jury's and the judge's unique opportunity to observe the witnesses, as well as the factfinder's responsibility to determine the credibility and weight of trial testimony." *Moore v Detroit Entertainment, LLC*, 279 Mich App 195, 202; 755 NW2d 686 (2008) (quotation marks and citation omitted).

MCL 55.285 sets forth how a notary public may properly verify a signature. It provides, in relevant part:

> (2) In taking an acknowledgment, the notary public shall determine, either from personal knowledge or from satisfactory evidence, that the person in the presence of the notary public and making the acknowledgment is the person whose signature is on the record.

> (3) In taking a verification upon oath or affirmation, the notary public shall determine, either from personal knowledge or from satisfactory evidence, that the person in the presence of the notary public and making the verification is the person whose signature is on the record being verified.

> (4) In witnessing or attesting to a signature, the notary public shall determine, either from personal knowledge or from satisfactory evidence, that the signature is that of the person in the presence of the notary public and is the person named in the record.

> (5) In all matters where the notary public takes a verification upon oath or affirmation, or witnesses or attests to a signature, the notary public shall require that the person sign the record being verified, witnessed, or attested in the presence of the notary public.

> (6) A notary public has satisfactory evidence that a person is the person whose signature is on a record if that person is any of the following:

> (a) Personally known to the notary public.

> (b) Identified upon the oath or affirmation of a credible witness personally known by the notary public and who personally knows the person.

> (c) Identified on the basis of a current license, identification card, or record issued by a federal or state government that contains the person's photograph and signature.

At the close of plaintiff's proofs, Sobh's attorney moved for a directed verdict, arguing that Sobh complied with the act when he relied on Mohamed's statement that the individual

-4-

appearing before Sobh was Ghabdan. Counsel argued that, at the time of the notarization, Sobh had no reason to believe that Mohamed was dishonest and, to the contrary, Sobh believed Mohamed was credible. The trial court agreed and ruled as follows:

> So there's an allegation here that there was some form of a conspiracy or confederation. I don't find any evidence on this record to support a claim that, in fact, there was a conspiracy.
>
> Clearly, there was testimony of both Mr. Sobh and Mr. Mohamed as to their own respective understanding of what occurred on that day of the notary. But I don't find any evidence of a conspiracy or confederation.
>
> ***
>
> As to Mr. Sobh, it's clear from the testimony as to what he understood occurred at the time. His testimony was clear. Clearly, there was some testimony brought out with regard to the deposition, which he then testified to as far as clarification.
>
> While there is some argument about his waffling I don't believe it reaches the level of cause in this Court to consider that he was not truthful.
>
> Clearly with regard to what occurred on this incident. The standard jury instruction – let's see the special jury instruction that was requested I believe by defendant, makes reference to a credible witness. Identifies a credible witness.
>
> And so I suppose there is some evidence that could be submitted subsequent to the notary, the actual notarization date that may go to a later determination as to whether or not the witness may be credible or not.
>
> The issue for this motion is as to Mr. Sobh, did he obtain information sufficient for him to satisfactorily determine, did he have satisfactory evidence through his own personal knowledge that, in fact, Mr. Ghabdan was, in fact, the gentleman who was signing.
>
> I don't find that there's sufficient evidence on this record to show to defeat that claim.
>
> That, in fact, the evidence seems clear to this Court that Mr. Sobh did, in fact, act within his own personal knowledge. That he was a credible witness. That the evidence was satisfactory for him to determine that the gentleman who apparently identified himself and if not the gentleman, Mr. Mohamed clearly identified the gentleman as Mr. Ghabdan, and for all of those reasons the motion for directed verdict as to Mr. Sobh is granted.

At issue here is whether Sobh violated the Notary Public Act. MCL 55.297(1) provides: "For the official misconduct of a notary public, the notary public and the sureties on the notary public's surety bond are liable in a civil action for the damages sustained by the persons injured."

"Official misconduct" is defined, in part, as "[t]he exercise of power or the performance of a duty that is unauthorized, unlawful, abusive, negligent, reckless, or injurious." MCL 55.265(f)(1).

The trial court did not err in directing a verdict in Sobh's favor on plaintiff's conspiracy allegation. Plaintiff presented absolutely no evidence that Sobh conspired with Mohamed to falsely notarize Ghabdan's signatures. "[A] conspiracy must be a combination of two or more persons by some concerted action to accomplish some criminal or unlawful purpose, or to accomplish some purpose not in itself criminal, by criminal or unlawful means." *Veriden v McLeod*, 180 Mich 182, 191; 146 NW 619 (1914). Plaintiff's strongly-worded allegations in its amended complaint were essentially abandoned at the time of the trial. There was no evidence that Sobh had any knowledge of the facts and circumstances giving rise to the settlement agreement or construction discharge liens. Even plaintiff's counsel seemed to imply that Sobh had been "duped" and was not part of some great conspiracy. Dr. Tarik Najib, plaintiff's highest officer, did not believe that Sobh was involved in a conspiracy.

However, the issue, then, becomes whether Sobh was negligent in notarizing the signatures. Najib believed that Sobh was negligent in failing to obtain identification before notarizing the individual's signatures, but Najib also acknowledged that the Notary Public Act does not require a notary to ask for identification. Instead, it clearly permits alternative forms of verifying an individual's identity. As previously stated, MCL 55.285(6)(b) permits notarization upon "satisfactory evidence that a person is the person whose signature is on a record if that person is . . . identified upon the oath or affirmation of a credible witness personally known by the notary public and who personally knows the person." The problem here is that the trial court simply accepted as true Sobh's version of events without addressing the fact that Mohamed testified to the contrary. In so doing, the trial court erroneously invaded the province of the jury to determine the credibility of the witnesses. Accordingly, we reverse the directed verdict as to whether Sobh individually violated the Notary Public Act.

## III. DIRECTED VERDICT IN FAVOR OF MOHAMED AND BLUE LOTUS

Plaintiff argues that the trial court erred when it directed a verdict in favor of Mohamed and Blue Lotus. We disagree. To the extent the issue involves a matter of statutory interpretation, such a question of law is likewise reviewed de novo. *Hecht v Nat'l Heritage Academies, Inc*, 499 Mich 586, 604-605; 886 NW2d 135 (2016).

The trial court properly determined that the Notary Public Act did not apply to either Blue Lotus or Mohamed. The preamble to the Notary Public Act provides:

AN ACT to provide for the qualification, appointment, and regulation of notaries; to provide for the levy, assessment, and collection of certain service charges and fees and to provide for their disposition; to create certain funds for certain purposes; to provide for liability for certain persons; to provide for the admissibility of certain evidence; to prescribe powers and duties of certain state agencies and local officers; to provide for remedies and penalties; and to repeal acts and parts of acts. [MCL 55, Refs & Annos.]

"Although a preamble is not to be considered authority for construing specific statutory terms, it is useful for determining the subject matter addressed by the statute." *Detroit Edison Co v Spartan Express, Inc*, 225 Mich App 629, 634; 572 NW2d 39 (1997). The preamble is likewise "useful for interpreting the purpose and scope of the act." *Capital Area District Library v Michigan Open Carry, Inc*, 298 Mich App 220, 230; 826 NW2d 736 (2012). The subject matter, purpose and scope of the Notary Public Act are clear and should come as no surprise. The Act applies only to notaries and their sureties.

The Notary Public Act does not apply to Blue Lotus and Mohamed unless they are considered Sobh's "employer." MCL 55.297 provides:

> (1) For the official misconduct of a notary public, the notary public and the sureties on the notary public's surety bond are liable in a civil action for the damages sustained by the persons injured. The employer of a notary public is also liable if both of the following conditions apply:
>
> (a) The notary public was acting within the actual or apparent scope of his or her employment.
>
> (b) The employer had knowledge of and consented to or permitted the official misconduct.

"Employer" is not defined in the Notary Public Act. Regardless of whether "employer" is determined to be a common term or a legal term of art, the definitions are similarly defined in both a lay dictionary and a legal dictionary. See *Brackett v Focus Hope, Inc*, 482 Mich 269, 276; 753 NW2d 207 (2008). When accorded its plain and ordinary meaning, "employer" is defined as "a person or business that employs one or more people, esp. for wages or salary . . .." *The Random House Dictionary of English Language: Second Unabridged Edition*. And, when accorded its legal definition, an "employer" is "[a] person who controls and directs a worker under an express or implied contract of hire and who pays the worker's salary or wages." *Black's Law Dictionary* (9th ed). Contrary to plaintiff's contention, there was no evidence that Mohamed was Sobh's "employer" under the Notary Public Act. Mohamed did not direct or control Sobh. At most, Mohamed engaged Sobh in occasionally performing notarizations or process serving. Therefore, given the fact that there was no evidence of a conspiracy and the Notary Public Act does not apply to Blue Lotus or Mohamed, the trial court properly directed verdicts in their favor on those claims.

## IV. SUMMARY DISPOSITION FOR MILLER AND THE LAW FIRM

Plaintiff argues that the trial court erred in granting Miller and the law firm summary disposition. We disagree. A trial court's decision on a motion for summary disposition is reviewed de novo. *Johnson v Recca*, 492 Mich 169, 173; 821 NWd 520 (2012).

Plaintiff cites *Fassihi v Sommers, Schwartz, Silver, Schwartz & Tyler, PC*, 107 Mich App 509, 515; 309 NW2d 645 (1981), to support its position that Miller and the law firm owed plaintiff a fiduciary duty. A fiduciary relationship may arise where the non-client shareholder reposes "faith, confidence, and trust" in the lawyer's advice or judgment. *Beaty v Hertzberg & Golden, PC* 456 Mich 247, 260-261; 571 NW2d 716 (1997), citing *Fassihi*; *Prentis Family*

*Foundation,* 266 Mich App at 43-44. However, that placement of trust, confidence, and reliance must be reasonable. "[I]t is unreasonable for a nonclient to repose confidence and trust in an attorney when any of the interests of the client and the nonclient are adverse." *Beaty,* 456 Mich at 260.

There is no record evidence that plaintiff placed faith, confidence or trust in Miller's or the law firm's advice or judgment. And, even if plaintiff had relied on communications or advice from Miller or the law firm, that reliance would not have been reasonable under the circumstances. Najib testified that Miller approached him about joining Blue Lotus/Mohamed in the lawsuit against Bloomfield and that he rejected the idea because "I said we were totally two separate entities." Absent any duty, Miller and the law firm were under no obligation to determine whether Ghabdan's signatures were forgeries and the trial court did not err in granting summary disposition.

## V. ADVERSE INFERENCE INSTRUCTION

Plaintiff argues that the trial court erred in approving an adverse inference jury instruction based on Najib's and Ghabdan's failure to provide signature exemplars. Although the trial court approved an adverse jury instruction, the instruction was never given. As such, there can be no claim of error regarding the instruction.

## VI. DISALLOWANCE OF EXEMPLARY DAMAGES

Plaintiff argues that the trial court erred when it found that plaintiff had not requested exemplary damages in its pleadings. We decline to address the issue, as it was inadequately briefed. Our Supreme Court has explained that adequate briefing is essential to proper appellate review:

> Neither question is argued in any real sense of the word and neither is briefed; they are simply announced. We are told in the brief that the claimed faulty instructions may be found elsewhere, but we are not told what these instructions were, why they might be faulty, or precisely where to look for them. This is insufficient to present these questions for consideration in this forum. It is not enough for an appellant in his brief simply to announce a position or assert an error and then leave it up to this Court to discover and rationalize the basis for his claims, or unravel and elaborate for him his arguments, and then search for authority either to sustain or reject his position. The appellant himself must first adequately prime the pump; only then does the appellate well begin to flow. [*Mitcham v City of Detroit*, 355 Mich 182, 203; 94 NW2d 388 (1959).]

Plaintiff's brief is woefully lacking in both fact and law. There is no citation to the record and no legal analysis whatsoever.

## VII. FAILURE TO CONDUCT AN EVIDENTIARY HEARING ON CASE EVALUATION SANCTIONS

We decline to address plaintiff's claim that the trial court abused its discretion in awarding case evaluation sanctions because the issue is inadequately briefed. What's more,

plaintiff failed to provide the relevant transcripts. "[T]his Court will refuse to consider issues for which the appellant failed to produce the transcript." *PT Today, Inc v Comm'r of Office of Fin & Ins Services*, 270 Mich App 110, 151–152; 715 NW2d 398, 424 (2006). Moreover, plaintiff does not contend that the hourly rate or hours expended are unreasonable; he merely contends that an evidentiary hearing should have been held as a matter of course. We have recently rejected this argument in *Cassidy v Cassidy*, 318 Mich App 463; ___ NW2d ___ (2017) ("There was no error in failing to conduct an evidentiary hearing given the fact that there was a sufficient record to review the issue, and the court fully explained the reasons for its decision.")

## VIII. PLAINTIFF'S MOTION FOR NEW TRIAL

Once again, plaintiff's claim that its motion for new trial was timely need not be addressed because the issue is inadequately briefed. In particular, plaintiff does not argue the merits of the motion, only its timeliness. Even though the trial court noted that plaintiff's motion was untimely, it nevertheless addressed the merits. Because plaintiff fails to address the substance of the motion, there is nothing to review.

## IX. LAY WITNESS TESTIMONY

Plaintiff argues that the trial court erred in allowing John Ricci, a handwriting expert, to offer lay witness testimony even though he had no knowledge of the facts giving rise to plaintiff's claim. "A trial court's decision to admit or exclude evidence is reviewed for an abuse of discretion." *Edry v Adelman*, 486 Mich 634, 639; 786 NW2d 567, 569 (2010). While we would be justified in declining to address the issue for inadequate briefing, we nonetheless briefly discuss this claim of error so that it is not repeated on remand.

Ricci was not allowed to testify as an expert witness due to unfair prejudice. He was allowed, however, to testify as a lay witness. MRE 602 provides, in part: "A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." MRE 701 further provides: "If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." Ricci testified that he had no knowledge of the circumstances regarding the way the alleged signatures were procured. He testified "[m]y examinations are purely done on what is presented to me as known writing, as compared against the signatures that are purported to be questioned." Ricci was completely unfamiliar with the facts giving rise to this case. He had no particular knowledge about when and how the signatures were made. Nor was he familiar with either man such that he could testify that the signatures appeared to be theirs. Instead, Ricci's testimony was based on a comparison between documents provided by defense counsel. In essence, Ricci was allowed to testify as an expert without the benefit of being declared an expert. His testimony was not rationally based on his own perceptions. See *Miller v Hensley*, 244 Mich App 528, 531; 624 NW2d 582 (2001). The trial court erred in allowing this testimony.

## X. EXCLUSION OF EVIDENCE RELATED TO SOBH'S FAILURE TO RESPOND TO AN INVESTIGATION BY THE OFFICE OF GREAT SEAL

Plaintiff argues that Sobh's failure to respond to an Office of Great Seal investigation into whether Sobh's notary public license should be suspended was an adoptive admission. Once again, this issue has been inadequately briefed and plaintiff has failed to provide the relevant transcript to facilitate review. This is especially troubling where the trial court's order indicates that the motion in limine to exclude evidence of Sobh's suspended notary license and investigative reports was granted "for the reasons stated on the record." However, we once again briefly address the issue because it may be capable of repetition on remand.

Pursuant to MRE 801(d)(2)(B), a statement is not hearsay if the statement is offered against a party and is "a statement of which the party has manifested an adoption or belief in its truth." However, "admissibility of a tacit admission under MRE 801(d)(2)(B) requires a 'statement . . .which the party has manifested an adoption or belief in its truth.' A 'statement' is defined by MRE 801(a) as '(1) an oral or written assertion or (2) nonverbal conduct of a person, if it is intended by the person as an assertion.' " *People v Solmonson*, 261 Mich App 657, 665–666; 683 NW2d 761 (2004). Plaintiff fails to draw a distinction between a tacit admission through silence and consciousness of guilt through demeanor or conduct. Here, Sobh made no statement nor did he exhibit affirmative conduct reflecting consciousness of guilt.

## XI. ADEQUACY OF THE VERDICT

Again, plaintiff's claim that the jury's verdict was too low is inadequately briefed. Not only does plaintiff fail to provide a comprehensive factual or legal analysis, but the issue is unpreserved as there is no record evidence that plaintiff raised the issue in the trial court. In fact, plaintiff's motion for new trial was based solely on the trial court's prior orders directing verdicts in favor of Sobh and Mohamed on plaintiff's claims under the Notary Public Act.

Affirmed in part, reversed in part and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Joel P. Hoekstra
/s/ Patrick M. Meter
/s/ Kirsten Frank Kelly

-10-